EMN:AH/PT/NS/BDM
F.#2016R00286

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

MIGUEL TRUJILLO,

Defendant.

- - - - - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. 16-108 (RJD)
(T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1), 982(b), 1349, 1956(h) and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 26, U.S.C., § 7206(1); T. 28, U.S.C., § 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION TO ALL COUNTS

At all times relevant to this Information, unless otherwise indicated:

I. Background

A. FIFA

1. The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football. FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland. FIFA comprised as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories. The United States first

became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following suit in the 1990s. At various times, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

2. Each of FIFA's member associations also was a member of one of six continental confederations recognized by FIFA: the Confederation of North, Central American, and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC"). Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations. Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

3. FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the executive body; and a general secretariat, which acted as the administrative body. FIFA also had a president, who represented

the association worldwide and was responsible for the implementation of decisions. FIFA also operated several standing committees whose members included soccer officials from various national member associations.

4. Under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

5. FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and creating and enforcing rules that govern the confederations and member associations. FIFA helped finance the confederations and their member associations, including by providing funds through the Financial Assistance Program and the Goal Program.

6. FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006, again in 2009, and most recently in 2012 (generally, the "code of ethics"). The code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues, and clubs. Among other things, the code

of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain. The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty. By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

7. Among other tournaments, FIFA organized the World Cup, the sport's premier event, a quadrennial international tournament involving the senior national men's teams of 32 nations.

B. CONCACAF

8. CONCACAF was a continental soccer confederation incorporated as a non-profit corporation in Nassau, Bahamas. CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean, and three South American countries. The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF. From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former

general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business.

9. Like FIFA, CONCACAF was governed by its own congress, general secretariat, executive committee, and standing committees.

10. Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based. CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. Among other tournaments, CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league - or club - teams. In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

11. CONCACAF also organized World Cup qualifier matches, using a variety of formats, and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

C. The Regional Federations and National Associations

12. In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

13. For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF"), and the North American Football Union ("NAFU"). The United States Soccer Federation was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

14. The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level.

D. The Sports Marketing Companies

15. FIFA, the continental confederations, the regional federations, and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other events, as well as other rights associated with the sport. Often operating in coordination with affiliated consultants and intermediaries,

these sports marketing companies, including multinational corporations with headquarters, offices, or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights. These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors, and sub-licensees, including those located in the United States.

16. The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for FIFA and its constituent organizations, as well as for the sports marketing companies. The United States was an increasingly important and lucrative market for the commercialization of these rights.

17. The Traffic Group was a multinational sports marketing company based in São Paulo, Brazil. The Traffic Group was comprised of, among other entities, Traffic Assessoria e Comunicações S/C Ltda. ("Traffic Brazil"), Traffic Sports International, Inc. ("Traffic International"), Traffic Sports USA, Inc., Traffic Sports Europe B.V., and Continental Sports International, Inc. (referred to collectively herein as "Traffic" or the "Traffic Group"). Beginning in or about 1990, Traffic expanded its operations into the United States,

partnering with and later acquiring a Florida company called Inter/Forever Sports, Inc. ("Inter/Forever"), which was renamed Traffic Sports USA, Inc. (collectively referred to below as "Traffic USA") in or about 2003.

18. Media World, LLC (together with its successor entities, "Media World") was a sports marketing company based in Miami, Florida. Media World was a subsidiary of Media Company A, which engaged in a variety of media activities primarily in the United States and Latin America, including television production and the commercialization of sports marketing rights. Media Company A, which was also based in Miami, was affiliated with Media Company B, a multinational media conglomerate based in Europe. The identities of Media Company A and Media Company B are known to the United States Attorney.

19. Sports Marketing Company A was a sports media and marketing business with its principal offices in Argentina. Sports Marketing Company A had a number of subsidiaries and affiliates, all of which are referred to collectively below as "Sports Marketing Company A." The identity of Sports Marketing Company A is known to the United States Attorney.

II. <u>The Defendant</u>

20. In or about and between 1999 and 2006, the defendant MIGUEL TRUJILLO was an employee of Traffic USA. Since about 2006, TRUJILLO was licensed by FIFA to serve as a match

agent to negotiate on behalf of member associations and schedule friendly matches against other FIFA-sanctioned teams. Since about 2006 TRUJILLO was also a consultant specializing in negotiating soccer media and marketing rights and the scheduling of friendly matches, principally with and on behalf of certain CONCACAF member associations. In addition to working as a consultant, from time to time TRUJILLO was involved in sports marketing ventures on his own behalf. TRUJILLO owned or controlled a number of small companies that he used in connection with his consulting and sports marketing work, including: Sponsports, LLC, which was organized in the state of Florida; and Sponsports, S.A., Lexani Advisors, Inc. ("Lexani"), and Sports Tournament and Rights, Inc. ("ST&R"), which were organized in Panama. TRUJILLO opened a bank account in the United States for Sponsports, LLC, and he arranged for bank accounts to be opened in Panama for the Panamanian corporate entities. TRUJILLO was a citizen of Colombia who resided in Palm Beach County, Florida since about 1999, and since about 2006 was a legal permanent resident of the United States.

III. <u>The Defendant's Co-Conspirators</u>

A. <u>Named Co-Conspirators</u>

21. At various times relevant to this Information, Roger Huguet was a high-ranking executive and part owner of Media World and its parent company Media Company A.

22. At various times relevant to this Information, Fabio Tordin was employed in the finance department of Traffic Brazil, working out of the São Paulo office, and, later, served as the chief executive officer of Traffic USA in Miami, Florida. In or about 2007 to 2010, while remaining based in Miami, Tordin was self-employed, including as a consultant in the field of soccer and media marketing rights. In or about 2011 to 2015, Tordin worked as an executive of Media World.

23. At various times relevant to this Information, Jeffrey Webb was the president of the Cayman Islands Football Association ("CIFA"), a member of the CFU executive committee, the chairman of CFU's normalization committee, the president of CONCACAF, and a FIFA vice president and executive committee member. Webb also served on multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup. Outside of soccer, Webb worked at various times as an executive of a bank in the Cayman Islands. Since approximately 2013, Webb owned a residence in the United States, specifically in Loganville, Georgia. Webb also owned other pieces of residential property in the United States, specifically in Stone Mountain, Georgia and Conyers, Georgia.

B. Unnamed Co-Conspirators

24. The identities of the following individuals are known to the United States Attorney:

25. At various times relevant to this Information, Co-Conspirator #1 was a high-ranking official of a national member association of FIFA, CONCACAF, and UNCAF.

26. At various times relevant to this Information, Co-Conspirator #2 was a high-ranking official of FIFA, CONCACAF, and a national member association of FIFA, CONCACAF, and UNCAF.

27. At various times relevant to this Information, Co-Conspirator #3 was a high-ranking official of a national member association of FIFA, CONCACAF, and UNCAF.

28. At various times relevant to this Information, Co-Conspirator #4 was a high-ranking official of CONCACAF and of a national member association of FIFA, CONCACAF, and UNCAF.

29. At various times relevant to this Information, Co-Conspirator #5 was a CONCACAF official.

30. At various times relevant to this Information, Co-Conspirator #6 was a high-ranking official of a national member association of FIFA, CONCACAF, and CFU.

31. At various times relevant to this Information, Co-Conspirator #7 was a controlling principal of Sports Marketing Company A.

32. At various times relevant to this Information, Co-Conspirator #8 was a controlling principal of Sports Marketing Company A.

33. At various times relevant to this Information, Co-Conspirator #9 was a high-ranking official of FIFA.

34. At various times relevant to this Information, Co-Conspirator #10 was a high-ranking official of CONCACAF and of a national member association of FIFA, CONCACAF, and UNCAF.

## IV. The Fraudulent Schemes

35. Beginning in or about 2008, the defendant MIGUEL TRUJILLO, together with others, participated in a series of bribery schemes in order to help Traffic USA and Media World obtain media and marketing rights to soccer matches from CONCACAF and certain CONCACAF member associations. TRUJILLO and his co-conspirators planned the schemes in the United States, among other locations, and used the wires of the United States to carry out the schemes, including by paying bribes from accounts at financial institutions in the United States. As part of these schemes, TRUJILLO and his co-conspirators over time agreed to pay millions of dollars of bribes and kickbacks to high-ranking officials of FIFA, CONCACAF, and several of CONCACAF's member associations.

### A. World Cup Qualifiers Schemes

#### i. UNCAF Region Schemes

36. Since at least in or about 1998, the media rights to matches played to qualify for the World Cup have been owned by the team designated as the "home team" for each qualifier

match. UNCAF's member associations sought to generate revenue by, among other things, selling the media rights they owned to their home World Cup qualifier matches. Each of the UNCAF member associations negotiated separately with prospective purchasers of the rights, which included Traffic USA and Media World. UNCAF member associations included UNCAF Federation A, UNCAF Federation B, and UNCAF Federation C, the identities of which are known to the United States Attorney.

37. In or about and between 2008 and 2015, the defendant MIGUEL TRUJILLO, together with Fabio Tordin, Roger Huguet, and others, caused Media World to enter into contracts with UNCAF Federation A to obtain media and marketing rights to that federation's 2014, 2018, and 2022 World Cup qualifier matches. In order to obtain those contracts, TRUJILLO, together with others, agreed to pay, and did pay, bribes to Co-Conspirator #1 and Co-Conspirator #2, who were high-ranking officials of UNCAF Federation A. TRUJILLO's role in the payment of these bribes included receiving wire transfers from Media World's bank account in Miami into Lexani's Panamanian bank accounts, and then causing those funds to be transmitted via wire transfer, at times through bank accounts in the United States, to accounts at banks in Central America as directed by Co-Conspirator #1 and Co-Conspirator #2. TRUJILLO and his co-

conspirators frequently used sham contracts to hide the true nature of these transactions.

38. In or about and between 2011 and 2015, Media World entered into a contract with UNCAF Federation B to obtain media and marketing rights to that federation's 2018 World Cup qualifier matches. In order to obtain that contract, Media World executives agreed to pay, and did pay, bribes to high-ranking officials of UNCAF Federation B, including Co-Conspirator #3. The defendant MIGUEL TRUJILLO agreed to facilitate these bribes, and did facilitate these bribes, by receiving wire transfers from Media World's bank account in Miami into Lexani's Panamanian bank account, and then causing those funds to be transmitted via wire transfer, at times through bank accounts in the United States, to a bank account in Panama as directed by Co-Conspirator #3.

39. In or about the spring of 2012, Media World and Traffic USA, which until that time had been competitors, agreed to pool their resources and share revenue earned from the purchase of rights to World Cup qualifier matches played by CONCACAF member associations.

40. In or about 2014, Traffic USA already owned the rights to qualifier matches hosted by UNCAF Federation C in connection with the 2014 and 2018 World Cups. Around that time,

Fabio Tordin and Roger Huguet, who were then both executives of Media World, learned that, rather than renewing UNCAF Federation C's contract with Traffic USA for the 2022 World Cup, or selling those rights to Media World, Co-Conspirator #4, who was a high-ranking official of UNCAF Federation C, was contemplating selling the rights to the federation's home qualifier matches to a third company.

41. Thereafter, the defendant MIGUEL TRUJILLO, Fabio Tordin, and Roger Huguet agreed to pay, and did pay, bribes to Co-Conspirator #4 in order to cause UNCAF Federation C to renew its contract with Traffic USA. TRUJILLO's role in the payment of these bribes included receiving wire transfers from Media World's bank account in Miami into ST&R's Panamanian bank account, and then transmitting those funds via wire transfer, at times through bank accounts in the United States, to a bank account in the Southern District of Florida as directed by Co-Conspirator #4. TRUJILLO and his co-conspirators used a sham invoice to hide the true nature of these transactions.

ii. <u>CFU Schemes</u>

42. Like UNCAF, CFU was a regional federation within CONCACAF. Like UNCAF member associations, CFU member associations sought to generate revenue by, among other things, selling the media rights they owned to their home World Cup qualifier matches. Unlike UNCAF member associations, however,

CFU member associations often negotiated as a group with prospective purchasers of the rights, including Traffic USA and Media World.

(a) <u>CFU World Cup Qualifiers Scheme</u>

43. As stated above, in or about the spring of 2012, Media World and Traffic USA agreed to pool their resources and share revenue earned from the purchase of rights to World Cup qualifier matches played by CONCACAF member associations. This agreement covered the media and marketing rights to CFU member associations' 2018 and 2022 World Cup qualifier matches.

44. On or about August 28, 2012, CFU entered into a contract with Traffic USA to sell Traffic USA the media and marketing rights to CFU member associations' 2018 and 2022 World Cup qualifier matches. Pursuant to the revenue sharing agreement described above, Media World was to share in the revenue from this contract. At the direction of Roger Huguet, the defendant MIGUEL TRUJILLO thereafter executed a series of wire transfer payments, which TRUJILLO understood were likely bribe payments for the benefit of Jeffrey Webb. In the course of arranging for these payments to be made, Huguet met with Co-Conspirator #5 in the Southern District of Florida.

45. The defendant MIGUEL TRUJILLO facilitated these bribe payments by using ST&R's Panamanian bank account to receive wire transfer payments from a production company

("Production Company A"), the identity of which is known to the United States Attorney, that was a wholly owned subsidiary of Media Company B. At the direction of Roger Huguet, TRUJILLO caused a false invoice to be submitted on behalf of ST&R to Production Company A. Ultimately, TRUJILLO, using funds ST&R received from Production Company A, made wire transfers from ST&R's Panamanian bank account totaling approximately $500,000 as part of this scheme. These payments included, among others, the following:

| DATE | WIRE COMMUNICATION |
|---|---|
| October 28, 2014 | Wire transfer of $80,000 from ST&R's account at Multibank in Panama, via a Bank of America correspondent account in New York, New York, for credit to an account at Citibank in Miami, Florida in the name of a Caymanian attorney whose identity is known to the United States Attorney. |
| December 2, 2014 | Wire transfer of $170,000 from ST&R's account at Multibank in Panama, via a Deutsche Bank Trust Company Americas correspondent account in New York, New York, for credit to an account in the name of Holding Company A, a British Virgin Islands holding company controlled by Co-Conspirator #5, the identity of which is known to the United States Attorney, at Loyal Bank Limited in St. Vincent and the Grenadines. |

TRUJILLO and his co-conspirators used a sham invoice from Holding Company A to hide the true nature of this bribe payment.

(b) CFU Federation A World Cup Qualifiers Scheme

46. As noted above, in or about the spring of 2012, CFU, on behalf of all of its member associations, negotiated with Traffic USA to sell to it, as a package, all of the CFU member associations' rights to qualifier matches they were to host in connection with the 2018 and 2022 World Cups. However, CFU Federation A, the identity of which is known to the United States Attorney, had not yet committed itself to selling its rights jointly with the other CFU member associations. In or about the spring of 2013, the defendant MIGUEL TRUJILLO, together with Fabio Tordin, agreed to pay, and did pay, a bribe to Co-Conspirator #6 to induce Co-Conspirator #6 to cause CFU Federation A to join the contract that CFU had negotiated with Traffic USA for the rights to home qualifier matches for the 2018 and 2022 World Cups. After Media World wired funds from its bank account in Miami to Sponsports, S.A.'s Panamanian bank account, TRUJILLO conveyed the bribe funds, via wire transfer from Lexani's Panamanian bank account, at times through bank accounts in the United States, to accounts as directed by Co-Conspirator #6. TRUJILLO and his co-conspirators used sham contracts to hide the true nature of these transactions.

B. UNCAF Region Friendlies Schemes

47. In or about and between 2009 and 2015, the defendant MIGUEL TRUJILLO and Fabio Tordin partnered to organize and promote friendly matches involving UNCAF Federation A and UNCAF Federation C, as well as matches involving other FIFA member associations. At times, these friendly matches were played at venues in the United States. In order to obtain the agreement of the federations to participate in these friendly matches, TRUJILLO and Tordin agreed to pay, and did pay, bribes to high-ranking officials of UNCAF Federation A, including Co-Conspirator #1 and Co-Conspirator #2, and UNCAF Federation C.

48. Payments in furtherance of this scheme were made by wire transfer from and through bank accounts in the United States, including the bank account of Sponsports, LLC in Palm Beach County, Florida controlled by the defendant MIGUEL TRUJILLO, to bank accounts outside the United States. In addition, TRUJILLO often made arrangements regarding these matches via interstate and international wire transmissions, including email messages, from Palm Beach County.

C. CONCACAF Media and Marketing Rights Scheme

49. Beginning in or about November 2011, the defendant MIGUEL TRUJILLO and Fabio Tordin, together with others, agreed to help facilitate the payment of bribes by Co-Conspirator #7 and Co-Conspirator #8 to Co-Conspirator #2, Co-

Conspirator #9, and Co-Conspirator #10, who were soccer officials with significant authority within CONCACAF, in order to cause CONCACAF to sell the rights to certain soccer tournaments to Sports Marketing Company A. At the time, Co-Conspirator #9 was one of CONCACAF's three representatives on the FIFA executive committee, and Co-Conspirator #2 and Co-Conspirator #10 were both members of the CONCACAF executive committee.

50. In furtherance of this scheme, in or about November 2011, upon invitation by Co-Conspirators #7 and #8, the defendant MIGUEL TRUJILLO and Fabio Tordin flew from Miami to Buenos Aires, Argentina, and Co-Conspirator #2, Co-Conspirator #9, and Co-Conspirator #10 also traveled to Argentina to meet Co-Conspirators #7 and #8. TRUJILLO helped make travel arrangements for Co-Conspirator #2 and his wife, including by sending email messages from the Southern District of Florida to Co-Conspirator #2 in Central America. During the days that followed, in Argentina and in Uruguay, TRUJILLO and Tordin met with Co-Conspirator #7 and Co-Conspirator #8, who controlled Sports Marketing Company A, and Co-Conspirator #2, Co-Conspirator #9, and Co-Conspirator #10. In the course of and as a result of these meetings, Co-Conspirator #2, Co-Conspirator #9, and Co-Conspirator #10 agreed to use their influence within CONCACAF to cause CONCACAF to sell the media and marketing

rights to certain soccer tournaments, including the Gold Cup, to Sports Marketing Company A. To obtain this agreement, Co-Conspirator #7 and Co-Conspirator #8 agreed to pay, and did pay, bribes to the three soccer officials.

51. The defendant MIGUEL TRUJILLO and his co-conspirators disguised the source and nature of the bribe payments that Co-Conspirator #7 and Co-Conspirator #8 paid to Co-Conspirator #2, Co-Conspirator #9, and Co-Conspirator #10 by wiring the funds from an account Co-Conspirator #7 and Co-Conspirator #8 controlled in Switzerland to Lexani's Panamanian bank account. TRUJUILLO then disbursed the funds to Co-Conspirator #2, Co-Conspirator #9, and Co-Conspirator #10 through wire transfers and other types of transactions out of Lexani's and Sponsports, S.A.'s Panamanian accounts.

52. In or about January 2012, Co-Conspirator #8 traveled to Miami, Florida in furtherance of Sports Marketing Company A's efforts to obtain these rights. In or about April 2012, Co-Conspirator #8 traveled to New York, New York, through John F. Kennedy International Airport in Queens, New York, also in furtherance of Sports Marketing Company A's efforts to obtain these rights.

* * * *

53. No disclosure of the foregoing bribery schemes was made to FIFA, CONCACAF, or CFU, including without limitation

to their respective executive committees, congresses, or constituent organizations.

COUNT ONE
(Money Laundering Conspiracy – World Cup Qualifiers Schemes)

54. The allegations contained in paragraphs 1 through 53 are realleged and incorporated as if fully set forth in this paragraph.

55. In or about and between 2008 and 2015, both dates being approximate and inclusive, within the Southern District of Florida, the defendant MIGUEL TRUJILLO, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT TWO
(Wire Fraud Conspiracy - UNCAF Region Friendlies Schemes)

56. The allegations contained in paragraphs 1 through 53 are realleged and incorporated as if fully set forth in this paragraph.

57. In or about and between 2009 and 2015, both dates being approximate and inclusive, within the Southern District of Florida, the defendant MIGUEL TRUJILLO, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and national member associations and their constituent organizations, including to deprive FIFA, CONCACAF, and national member associations and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls, and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT THREE
(Wire Fraud Conspiracy -
CONCACAF Media and Marketing Rights Scheme)

58. The allegations contained in paragraphs 1 through 53 are realleged and incorporated as if fully set forth in this paragraph.

59. In or about and between November 2011 and April 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MIGUEL TRUJILLO, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and CONCACAF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls, and email messages, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT FOUR

(Fraud and False Statements in Tax Returns)

60. The allegations contained in paragraphs 1 through 53 are realleged and incorporated as if fully set forth in this paragraph.

61. On or about January 11, 2015, within the Southern District of Florida, the defendant MIGUEL TRUJILLO, a resident of Florida, did knowingly and willfully make and subscribe a United States Personal Income Tax Return, Form 1040, for the tax year 2013, which was verified by a written declaration that it was made under penalties of perjury and which was filed with the Internal Revenue Service, which tax return TRUJILLO well knew was not true and correct as to every material matter, in that said return reported that he had taxable income of $18,932, whereas, as TRUJILLO then and there well knew and believed, he received taxable income substantially greater.

(Title 26, United States Code, Section 7206(1); Title 18, United States Code, Sections 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

62. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any and

all property, real or personal, involved in such offense, or any property traceable to such offense.

63. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS TWO AND THREE

64. The United States hereby gives notice to the defendant that, upon his conviction of the offenses charged in

Counts Two and Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of such offenses.

65. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any

other property of the defendant, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK