COURT EXHIBIT

2

# ALLOCUTION
# OF
# MIGUEL TRUJILLO

*********************************

A. **INTRODUCTION**

My name is Miguel Trujillo. I am a citizen of Colombia, and I have been a legal permanent resident of the United States since about 2006. I moved from Colombia to the United States in about 1999, and since I moved to the United States I have lived in Palm Beach County, Florida.

From about 1999 until about 2006, I was employed by a sports marketing company in Miami called Inter/Forever Sports, and then by the successor company to Inter/Forever in Miami, which is called Traffic USA.

Since about 2006 I have been self-employed as a consultant in the field of soccer and media and marketing rights. I have conducted that business through a number of companies that I have owned or controlled, including through a Florida limited liability company that had a bank account at an American bank in Palm Beach County, Florida; and through three Panamanian companies, which all had bank accounts in Panama at Panamanian banks. I have been licensed by FIFA to act as a match agent on behalf of soccer federations, and negotiate friendly matches on their behalf.

B. **COUNTS**

I. **Money Laundering Conspiracy – World Cup Qualifiers Schemes**

UNCAF WCQ SCHEMES

Media World is a sports marketing company in Miami. During the period from about 2008 to 2015, together Roger Huguet and Fabio Tordin, who were executives of Media World, and other people, I caused a soccer federation that was part of the Central American soccer union, known as UNCAF, to enter into contracts with Media World. In these contracts, that soccer federation sold Media World media and marketing rights owned by that federation in connection with that federation's home World Cup qualifier matches played in advance of the 2014, 2018 and 2022 World Cups. Similarly, during the period from about 2011 to 2015, I agreed with executives of Media World and others to cause a second UNCAF soccer federation to enter into a similar contract with Media World for the media and marketing rights to that federation's home World Cup qualifier

matches played in advance of the 2018 World Cup. And during the period from about 2014 to 2015, I agreed with Tordin, Huguet and others to cause a third UNCAF soccer federation to enter into a contract with Traffic USA. In this contract, that federation sold to Traffic USA the media and marketing rights owned by that federation in connection with that federation's home World Cup qualifier matches played in advance of the 2022 World Cup.

Together with Huguet, Tordin and other people, in order to cause these federations to enter these contracts, I agreed that Media World would pay, and helped Media World pay, hundreds of thousands of dollars in bribes to high ranking officials at these federations. I facilitated paying these bribes to these federation officials by receiving wire transfers from Media World's bank accounts in Miami into the Panamanian accounts of companies I controlled, and I distributed the funds from these accounts to various bank accounts at the direction of the federation officials. I also received money from Media World for myself as compensation for serving as the intermediary for the bribes I helped Media World pay to certain of these officials. My co-conspirators in this scheme and I often used sham contracts and invoices in an effort to disguise the true nature of these transactions.

CFU WCQ SCHEMES

During the period from about 2012 to 2014, I agreed with Roger Huguet, who was then an executive at Media World, that I would help him make a series of wire transfer payments that I believed were bribe payments. Huguet and I had discussions about this topic while we were both in South Florida. To help him make these bribe payments, I used the Panamanian bank account of a company I controlled in order to receive a wire transfer from a European company that was affiliated with Media World. Then I made further wire transfers out of the Panamanian account to other accounts at Huguet's direction, worth hundreds of thousands of dollars. At least one of these wire transfers out of the Panamanian account I controlled was to an account at an American bank in South Florida. Also Huguet's direction, I sent a sham invoice on behalf of a Panamanian company I controlled to the European company that wired these funds into my Panamanian account. On at least one occasion, the Panamanian company I controlled received a sham invoice from the recipient of these funds.

In about the spring of 2013, together with Fabio Tordin, who was an executive at Media World, I agreed to pay, and did pay, a bribe to a high-ranking official of a soccer federation that was part of the Caribbean Football Union, known as CFU, to cause that official's federation to join the contract that CFU had negotiated with Traffic USA for the media and marketing rights to CFU federations' home qualifier matches in advance of the

2018 and 2022 World Cups. Pursuant to my agreement with Tordin, after Media World sent funds from its bank account in Miami to the Panamanian bank account of a company I controlled, I conveyed these funds, via wire transfer and by other means, to the high-ranking official of the CFU soccer federation. Tordin and I used sham contracts to hide the true nature of these bribe payments.

## II. Wire Fraud Conspiracy – Friendly Matches Scheme

As it relates to Count Two, I partnered with Tordin to organize and promote friendly matches involving various UNCAF member associations, as well as other friendly matches involving other FIFA member associations. Many of these friendly matches were played in the United States.

In order to obtain the agreement of these federations to participate in these friendly matches, the co-conspirator and I agreed to pay, and did pay, tens of thousands of dollars in bribes to high-ranking officials of various soccer federations, including officials of two different UNCAF federations.

Some of these payments were made by wire transfers from a U.S. bank account I controlled to bank accounts outside the United States. Also, I often arranged these friendly matches through telephone, facsimile and electronic mail communications from South Florida to other people who were overseas.

## III. Wire Fraud Conspiracy – CONCACAF Rights Scheme

As it relates to Count Three, in around the time period between November 2011 and May 2012, I, together with others, agreed to help facilitate the payment of bribes by two Argentinian sports marketing company executives to three CONCACAF soccer officials. I had a prior relationship with some of these officials, and that is why the Argentinian executives asked me to facilitate this bribery scheme. The purpose of this agreement to pay these bribes was to obtain the soccer officials' agreement to cause CONCACAF to sell to the Argentinians' company the media and marketing rights to certain soccer tournaments, including the Gold Cup.

In around November 2011, Fabio Tordin and I traveled from Miami, Florida, to Buenos Aires, Argentina, in furtherance of this conspiracy, at the invitation of the Argentinian executives. In Argentina, and also during the same trip in Uruguay, Tordin and I met with the Argentinian executives and the three CONCACAF officials.

During the course of these meetings, the three soccer officials agreed to seek to cause CONCACAF to sell those rights to the Argentinians' company, in exchange for bribes totaling hundreds of thousands of dollars. The Argentinians did in fact pay these bribes to the officials by wiring funds from a bank account they controlled in Switzerland to the Panamanian bank account of a company I controlled. From there, I distributed the money at the direction of the three soccer officials, by wire transfer or by check.

In 2012 one of the Argentinians traveled to Florida and to New York City to meet with CONCACAF officials in furtherance of this scheme.

Fictitious contracts, as well as other methods and means, were used as part of this scheme to conceal the true nature of the bribe payments.

* * *

With respect to each of these three schemes, I understood that the soccer officials who received bribes owed a duty of trust and loyalty to the soccer federations they represented, and to CONCACAF and FIFA, and that they violated that duty by using their positions of authority and trust to enrich themselves. I did not disclose the bribe payments to FIFA, CONCACAF or anyone at the referenced soccer federations, other than to those officials who received bribes, and I understood that these officials would not disclose the payments, either. When I agreed with other people to make these payments to soccer officials in violation of their duties of loyalty, I knew that what I was doing was wrong.

### IV. Fraud and False Statements In Tax Returns For 2013

As it relates to Count Four, I filed my 2013 IRS Personal Income Tax Return, Form 1040, on or about January 11, 2015, within the Southern District of Florida where I reside. I signed and verified that return, under the pains and penalties of perjury, and reported my taxable income as $18,932 even though I knew that my actual taxable income was more than that. In particular, at the time I filed that tax return I understood that the accountant I had hired to prepare these tax returns was dishonest. I therefore believed that he was preparing my returns in such a way as to wrongly and inaccurately reduce the amount I would pay as a result of that return, in light of the fact that my business in the United States had gross receipts far more than what was listed for it in the tax returns the account prepared and I signed under penalties of perjury, and that my lifestyle could not have been supported on an annual income of less than $20,000. I knew that it was illegal for me to make this false statement under penalty of perjury.